# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ALBERT STEVEN TATE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 7:18cv00044** |
| **v.** | ) | <u>**MEMORANDUM OPINION**</u> |
| | ) | |
| **MAJOR BRIAN PARKS,** | ) | **By: Hon. Pamela Meade Sargent** |
| **Defendant.** | ) | **United States Magistrate Judge** |
| | ) | |

Albert Steven Tate, ("Tate"), an inmate previously housed in the Southwest Virginia Regional Jail, ("SWVRJ"), in Duffield, Virginia, ("the Jail"),[1] filed this case, pro se, pursuant to 42 U.S.C. § 1983. By Amended Complaint, (Docket Item No. 32),[2] Tate sues SWVRJ employee Major Brian Parks,[3] Chief of Security at the Jail.

This matter is before the court on the Defendant's Motion For Summary Judgment, (Docket Item No. 39) ("Motion"). The plaintiff has responded to the Motion, (Docket Item No. 59),[4] and the defendant has filed a reply, (Docket Item No. 63). Therefore, the Motion is ripe for decision.

---

[1] Tate currently is housed at Keen Mountain Correctional Center.

[2] Tate's Amended Complaint is neither sworn nor made under penalty of perjury.

[3] In his Amended Complaint, Tate also sued Major George Hembree, but, by Order dated July 2, 2018, Hembree was terminated as a defendant pursuant to FED. R. CIV. P. R. 21. (Docket Item No. 33.

[4] Tate's response to the Motion is neither sworn nor made under penalty of perjury.

*I. Facts*[5]

In his Amended Complaint and response to the Motion, Tate alleges various constitutional violations, including violations of his procedural due process rights and equal protection rights under the Fourteenth Amendment and violations of his First Amendment rights.

The undisputed facts in this case are as follows. Tate was transferred to the Jail on August 4, 2016, and placed in segregation as a pretrial detainee while awaiting trial on charges of rape, sexual assault and forcible sodomy out of the Circuit Court in Scott County, Virginia. (Docket Item No. 40-1 at 2.) On or about August 15, 2016, he sent a coded letter to his wife, outlining an escape plan and seeking her assistance to escape custody during an upcoming bond hearing at the Scott County Circuit Court. (Docket Item No. 40-2 at 2-7.) Tate's wife refused to help with this attempt. The Commonwealth's Attorney for Scott County was alerted to the escape plan, and Tate was confronted with this letter at a September 8, 2016, bond hearing. Tate does not dispute that he wrote the letter. He was charged with felony attempted prisoner escape in Scott County Circuit Court, to which he ultimately pleaded guilty on May 26, 2017. (Docket Item No. 40-2 at 11-17; Docket Item No. 40-4 at 2-5.) Upon his return to the Jail following the September 8 bond hearing, Tate was placed in the Special Housing Unit, ("SHU"), in administrative segregation. (Docket Item No. 40-1 at 3.) As a result of Tate's use of the mail to aid in his attempted escape plan, the Jail began to inspect his outgoing nonlegal mail. (Docket Item No. 40-1 at 2.) On January 25, 2018, Tate

---

[5] Because Tate is proceeding pro se, his Amended Complaint will be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (allegations of pro se complainants are held to less stringent standards than formal pleadings drafted by lawyers).

pleaded guilty to the crimes for which he was originally being held at the Jail, and on January 30, 2018, he was sentenced for these crimes. (Docket Item No. 40-1 at 3.) On February 2, 2018, Tate was removed from the SHU to maximum security housing. (Docket Item No. 40-1 at 3.) He was thereafter transferred to the Virginia Department of Corrections on April 26, 2018. (Docket Item No. 40-1 at 2.)

In support of his claims, Tate has supplied the court with several Request For Information forms, (hereafter, "Request(s)"), directed to various individuals, including Defendant Parks. Tate alleges that, as a pretrial detainee at the Jail, he had a right under the Fourteenth Amendment to be free of any type of punishment. In his Amended Complaint, he states that when he was transferred to the Jail on August 4, 2016, as a pretrial detainee, he was placed in segregation without any explanation. He further alleges that, on September 8, 2016, after returning from the bond hearing, he was placed in administrative segregation in the SHU as a form of punishment for the alleged escape attempt, all while still a pretrial detainee. On October 5, 2016, Tate sent Parks a Request about being moved out of "protective custody" and into a pod. (Docket Item No. 59-1 at 1.) Parks responded on October 7, 2016, stating that Tate was not on protective custody, but in the SHU, as the result of an administrative decision based on the attempted escape charge, which made him a security threat. (Docket Item No. 59-1 at 1.) Also on October 7, 2016, Tate sent Parks another Request, asking for access to the "computer" to research case specifics regarding his alleged charges. (Docket Item No. 59-1 at 2.) Parks responded on October 11, 2016, stating that, in the SHU, Tate could have access to Black's Law Dictionary. (Docket Item No. 59-1 at 2.) On October 13, 2016, Tate sent a Request to Parks, inquiring why he remained in the SHU, as a security threat, when another inmate received a plea deal for escape charges and was transferred out of the SHU. (Docket Item No. 59-1 at 5.) Parks responded on

October 18, 2016, that he could not discuss another inmate's housing assignment or circumstances with Tate. Parks further advised Tate that Tate had a pending escape charge and that his situation may be reevaluated once he was found either innocent or guilty thereof. (Docket Item No. 59-1 at 5.) On January 31, 2017, Tate sent at Request to Parks asking for the same privileges as inmates in another housing unit, including television, paper, commissary, books and "2 hours out time." (Docket Item No. 59-1 at 8.) On February 1, 2017, Parks responded that inmates housed in the SHU, regardless of the reason, are all subject to the same restrictions. On June 4, 2017, Tate sent a Request to Counselor Hill, asking that the law library be brought to the sallyport door to allow him access to it. (Docket Item No. 59-1 at 3.) Counselor Hill responded on June 5, 2017, that the law library was not available in "8B," where Tate was housed, but advised him that he may use Black's Law Dictionary by requesting it from Lt. Hayes. (Docket Item No. 59-1 at 3.) Also on June 4, 2017, Tate sent a Request to Parks, stating he had a constitutional right to access to the law library. (Docket Item No. 59-1 at 4.) He requested again that the "computer" be brought to the sallyport area. Parks responded on June 8, 2017, advising him to contact Counselor Hill. (Docket Item No. 59-1 at 4.)

On May 10, 2017, Tate sent a Request regarding changing his housing status since there were inmates convicted of escape housed in the work pod. (Docket Item No. 59-1 at 11.) Parks responded on May 15, 2017, stating that Tate's escape charge was not a housing charge, but that he was charged criminally in Scott County Virginia. He further stated that as long as Tate was housed in the SHU, he was subject to any and all restrictions placed on other inmates. (Docket Item No. 59-1 at 11.) On May 12, 2017, Tate sent a Request to Parks, asking that if Tate required a higher security status and was such a threat, why were other inmates,

who had been charged with escape and "pending escape," whom he specifically named, allowed to be housed in the work pod, minimum, medium and maximum housing units. (Docket Item No. 59-1 at 14.) On May 15, 2017, Parks responded that he could only speak to Tate regarding his situation, and he could not discuss other inmates with Tate. (Docket Item No. 59-1 at 14.) On May 18, 2017, Tate sent another Request to Parks, stating that there were other inmates with escape charges out of Scott County who were housed in other pods. (Docket Item No. 59-1 at 15.) Tate asked why he was being kept in the SHU. On May 22, 2017, Parks responded, advising Tate that it was his own actions which placed him in the SHU and which ensured that he would remain incarcerated until the judge either released him or he had served whatever sentence he ultimately received. (Docket Item No. 59-1 at 15.) He further advised Tate that he had an obligation to provide and promote public safety. Also on May 22, 2017, Parks advised Tate that either he or Major George Hembree would decide when, or if, Tate would be moved out of the SHU. (Docket Item No. 59-1 at 17.) On May 26, 2017, Parks informed Tate that it had been explained to him why he was housed in the SHU. (Docket Item No. 59-1 at 18.) Parks further stated that the SHU is different than maximum housing. He also stated that he, as Chief of Security, made the determination regarding Tate's housing status and that Tate would be notified when a change occurred. On June 2, 2017, Parks stated that there was no timeline for how long Tate would remain in the SHU on administrative segregation, but when it changed, Tate would be notified. (Docket Item No. 59-1 at 21.)

In a May 26, 2017, Request to "Mail," Tate stated that on the back of an envelope of a piece of his mail, it was stamped as follows: "This outgoing mail has not been censored or searched by the SWVRJA," and he asked if this was correct. (Docket Item No. 59-1 at 29.) The response on May 30, 2017, was that this was

correct and that all outgoing mail is stamped. (Docket Item No. 59-1 at 29.) In another Request to "Inmate Accounts / Mail," on May 30, 2017, Tate asked why, if the envelopes are so stamped, was his mail opened and copies made when he did not get an order from the judge in a search warrant, thereby making the stamp a lie. (Docket Item No. 59-1 at 30.) In a response, dated May 31, 2017, it is stated that mail is not illegally tampered with. (Docket Item No. 59-1 at 30.) While Tate sent another Request to "Inmate Accounts / Mail," dated May 31, 2017, it is unclear exactly what he is seeking. It appears, however, that he is disputing that his outgoing mail was not tampered with. (Docket Item No. 59-1 at 31.) On June 2, 2017, the response[6] states that no rights were violated. (Docket Item No. 59-1 at 31.) In his Amended Complaint, Tate states that the Commonwealth's Attorney handed him a letter during court which stated on both the front and back "Rec'd 5-25-17." However, this letter had not been processed by the United States Postal Service. Also, Tate stated that the back of the letter had not been stamped by the Jail. Tate alleges that, in a court response, Parks stated that it was the recipient who had taken the letter to the Commonwealth's Attorney and copied it for them, which, according to Tate, would not be possible since the letter had no proof of being scanned and delivered by the United States Postal Service. On June 12, 2017, Parks responded to a Request, asking why outgoing mail was opened and resealed, then stamped "the contents have not been searched by SWVRJA." (Docket Item No. 59-1 at 32.) Parks stated that no laws were violated and that mail was not searched. (Docket Item No. 59-1 at 32.) He further stated that outgoing mail is considered property of SWVRJA until it is delivered to the United States Post Office. (Docket Item No. 59-1 at 32.)

---

[6] The signature of the individual responding to all of these Requests to "Mail" or "Inmate Accounts / Mail" is the same, but is illegible. What is clear is that it is not the signature of Defendant Parks.

In support of his Motion, Parks has submitted an affidavit from Jeannie Patrick, (Docket Item No. 40-1, "Patrick Affidavit"), the Administrative Lieutenant at the Jail. According to Patrick, administrative special housing is not a punitive or disciplinary measure. (Patrick Affidavit at 1.) Instead, administrative special housing is utilized if an inmate is pending investigation of a serious violation of facility rules, poses a security threat to the facility or other inmates, is pending investigation for a criminal act while incarcerated as an inmate in the facility, requires admission to ensure the inmate's protection (at the request of the inmate or based on the staff's determination), is pending transfer to another facility or return to the participating jurisdiction or has been classified as needing more intense supervision due to behavior. (Patrick Affidavit at 1-2.) Tate was housed at the Jail from August 4, 2016, until April 26, 2018, when he was transferred to the Virginia Department of Corrections. (Patrick Affidavit at 2.) Tate was housed at the Jail on criminal charges of rape, sexual assault and forcible sodomy in Scott County Circuit Court. (Patrick Affidavit at 2.) On or about August 15, 2016, Tate sent a letter to his wife, which included requests, in code, for her to assist him in escaping from custody. (Patrick Affidavit at 2.) This letter was forwarded by Tate's wife to the Scott County Commonwealth's Attorney. (Patrick Affidavit at 2.) The Jail did not censor, delete, redact, alter or otherwise fail to deliver any of Tate's legal or nonlegal mail. (Patrick Affidavit at 2.) As a result of Tate's escape attempt and use of the mail to facilitate this attempted escape, all of Tate's nonlegal mail was inspected prior to being placed in the mail. (Patrick Affidavit at 2.) Defendant Parks is not personally involved in the inspection of Tate's or any other inmate's mail. (Patrick Affidavit at 2.)

On September 8, 2016, a bond hearing was held in Tate's criminal case. (Patrick Affidavit at 2.) As a result of Tate's escape plan, he was charged with

attempted felony prisoner escape, to which he ultimately pleaded guilty on May 26, 2017. (Patrick Affidavit at 2.)

The Jail uses a points-based classification system to determine an inmate's security classification. (Patrick Affidavit at 3.) All inmates are administratively classified using this points-based system. (Patrick Affidavit at 3.) The system takes into account the severity of the inmate's current charges, serious offense history, escape history, institutional disciplinary history, prior felony convictions, alcohol or drug abuse history and stability factors. (Patrick Affidavit at 3.) Tate's points-based security classification placed him in the highest classification level of "maximum." (Patrick Affidavit at 3.) In conjunction with his security classification of maximum, Tate's escape attempt necessitated his housing in administrative special housing, as he was deemed to be an escape risk and a security threat, warranting additional supervision provided there. (Patrick Affidavit at 3.)

On February 27, 2017, Tate was ordered to mental health treatment after the Scott County Circuit Court found him incompetent to stand trial. (Patrick Affidavit at 3.) He was housed at the State Hospital in Petersburg, Virginia, from March 7, 2017, until April 14, 2017, when he returned to the Jail. (Patrick Affidavit at 3.) Tate was housed in medical housing from April 18 until April 19, 2017, for suicidal gestures and/or ideations. (Patrick Affidavit at 3.) On September 3, 2017, Tate's cell was searched in accordance with Jail policy. (Patrick Affidavit at 3.) The search revealed that Tate was in possession of tobacco and three Suboxone pills, the possession of which is a violation of the inmate code of conduct and Jail rules. (Patrick Affidavit at 3.) On January 25, 2018, Tate pleaded guilty to the initial criminal charges of rape, sexual assault and forcible sodomy and was sentenced on January 30, 2018. (Patrick Affidavit at 3.) Following Tate's guilty

pleas and sentencing, an administrative classification evaluation resulted in him being taken off of administrative special housing status on February 2, 2018. (Patrick Affidavit at 3.)

## II. Analysis

Defendant Parks argues that, pursuant to Federal Rules of Civil Procedure Rule 56, he is entitled to judgment as a matter of law on all of Tate's claims against him. For the reasons that follow, I agree.

Pro se complaints, such as the one filed by Tate, are held to a less stringent standard then those drafted by counsel. *See Haines*, 404 U.S. at 520; *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Furthermore, the court should liberally construe a complaint filed by a pro se litigant to allow the development of a potentially meritorious case. *See Hughes v. Rowe*, 449 U.S. 5, 9-12 (1980). The requirement to liberally construe a pro se complaint does not mean, however, that the court may ignore a clear failure to plead sufficient facts to support a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

Defendant Parks's Motion is supported by Patrick's affidavit and attached exhibits. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine dispute of

material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

Tate argues that he was denied his procedural due process rights under the Fourteenth Amendment by being placed in administrative segregation as a punishment while a pretrial detainee at the Jail. Tate is correct that, under the Fourteenth Amendment, "the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of 'punishment.'" *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "By definition, pretrial detainees have not been convicted of the crimes with which they are charged." *Dilworth v. Adams*, 841 F.3d 246, 251 (4th Cir. 2016). Therefore, the Supreme Court held in *Bell v. Wolfish*, they retain a liberty interest in freedom from "punishment," even while they are

detained to ensure their presence at trial. *Dilworth*, 841 F.3d at 251 (quoting 441 U.S. 520, 535-37 (1979)). Though "[l]oss of freedom of choice and privacy are inherent incidents" of pretrial detention, discrete "punitive measures" imposed during pretrial detention intrude on a protected liberty interest. *Dilworth*, 841 F.3d at 251 (quoting *Bell*, 441 U.S. at 537); *Surprenant v. Rivas*, 424 F.3d 5, 17 (1st Cir. 2005) ("Pretrial detainees, unlike convicts, have a liberty interest in avoiding punishment[.]"); *Martin*, 849 F.2d at 870 (finding pretrial detainees are protected with respect to "<u>any</u> form of 'punishment'") (emphasis in original).

It is important to note that the Fourth Circuit Court of Appeals has held that the "atypical and significant hardship" standard set forth in *Sandin v. Conner*, 515 U.S. 472 (1995), does not govern the procedural due process claim of pretrial detainees such as Tate. *See Dilworth*, 841 F.3d at 252 (citing *Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1348-49 (11th Cir. 2016); *Hanks v. Prachar*, 457 F.3d 774, 776 (8th Cir. 2006) (per curiam); *Suprenant*, 424 F.3d at 17; *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090, 1106 n.12 (10th Cir. 2005); *Benjamin v. Fraser*, 264 F.3d 175, 188-89 (2d Cir. 2001); *Rapier v. Harris*, 172 F.3d 999, 1004-05 (7th Cir. 1999); *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996)); *see also Fuentes v. Wagner*, 206 F.3d 335, 342 n.9 (3rd Cir. 2000) (holding *Sandin* inapplicable to detainee convicted but not yet sentenced), *cert. denied*, 531 U.S. 821 (2000). Instead, in *Dilworth*, the Fourth Circuit held that a pretrial detainee is entitled, under *Bell*, to procedural due process in connection with any "punishment" imposed on him by a correctional facility. *See* 841 F.3d at 252. That being the case, this court must determine whether Tate's placement in administrative segregation constitutes "punishment" within the meaning of *Bell*. That a "disability is imposed for the purpose of punishment," the Court held in *Bell*, may be clear from "an expressed intent to punish on the part of detention … officials[.]" 441 U.S. at 538.

If it is not, then a court still may infer an intent to punish if a "restriction or condition is not reasonably related" to some other legitimate goal. *Bell*, 841 U.S. at 539; *see Martin*, 849 F.2d at 870 (to establish that a restriction is "punishment," a pretrial detainee must show "either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective"); *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 251 (4th Cir. 2005) (same).

Here, there is no evidence of an expressed intent to punish Tate by Defendant Parks. In her affidavit, Patrick stated that administrative segregation is not a punitive or disciplinary measure, but is used in various situations, including where the inmate is pending investigation of a serious violation of facility rules, poses a security threat to the facility or other inmates, is pending investigation for a criminal act while incarcerated as an inmate in the facility, requires admission to ensure the inmate's protection (at the request of the inmate or based on the staff's determination), is pending transfer to another facility or return to another jurisdiction or has been classified as needing more intense supervision due to behavior. According to Patrick, the Jail uses a points-based classification system to determine an inmate's security classification. Tate's points-based security classification placed him in the highest classification level of "maximum." In conjunction with his initial security classification, his escape attempt, which occurred very soon after his arrival at the Jail, Patrick said, necessitated Tate's housing in the administrative segregation unit. He was deemed to be an escape risk and a security threat, warranting additional supervision provided in administrative segregation. Defendant Parks's responses to Tate's many Requests echoed these reasons for Tate's placement in administrative segregation.

Furthermore, I find that the uncontradicted evidence shows that Tate's placement in administrative segregation was reasonably related to the legitimate nonpunitive governmental objective of maintaining safety and security within the Jail. Tate's initial housing placement was "maximum" based on his serious criminal charges of rape, sexual assault and forcible sodomy. However, within days of arriving at the Jail, he sent a letter to his wife, seeking her assistance with an escape plan, which was to be set in motion during an upcoming bond hearing. Tate does not deny that he sent this letter to his wife. In fact, he pleaded guilty to a charge as a result of this escape plan. These facts combined show a legitimate governmental interest in housing Tate in administrative segregation, not as a punishment, but to ensure the safety and security of the Jail. Therefore, I further find that no intent to punish Tate may be inferred by the court from the facts presented.

For these above-stated reasons, I find that there is no genuine dispute of material fact with regard to whether Tate's placement in administrative segregation while a pretrial detainee constituted punishment. Thus, I further find that there is no genuine dispute of material fact with regard to whether Tate's Fourteenth Amendment procedural due process rights were violated by Defendant Parks in this manner. That being the case, I will grant Parks's Motion on this claim and enter summary judgment in his favor.

Tate also raises an equal protection claim under the Fourteenth Amendment against Defendant Parks. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotation marks and alteration omitted). The

Equal Protection Clause commands that similarly situated persons be treated alike. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To state a claim under the Equal Protection Clause, Tate's allegations must demonstrate: (1) "that he has been treated differently from others with whom he is similarly situated" and (2) that the differential treatment "was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001); *Latson v. Clarke*, 249 F. Supp. 3d 838, 863 (W.D. Va. 2017) (quoting *King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016)). Only if a plaintiff establishes disparate treatment will the court consider whether the difference in treatment is justified under the applicable level of scrutiny. *See King*, 825 F.3d at 220. Although a prisoner does not forfeit his constitutional right to equal protection by having been convicted of a crime and imprisoned, prisoner claims under the Equal Protection Clause must be analyzed in light of the special security and management concerns in the prison system. *See Morrison*, 239 F.3d at 655 (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)). For the reasons that follow, I find that Tate can show neither of these elements of an Equal Protection claim.

In his Amended Complaint, Tate specifically names multiple inmates whom he alleged had escape charges and/or convictions,[7] but who were not housed in administrative segregation. Instead, Tate alleged that these inmates were housed in the work pod, minimum housing, medium housing or maximum housing. As stated previously, Patrick provided sworn testimony that each individual inmate's housing classification is determined by using a points-based system, which

---

[7] It is unclear from Tate's Amended Complaint whether these were institutional charges or criminal charges and whether or not these inmates were actually convicted of such charges. Additionally, Tate noted that one of the inmates was "pending escape."

considers an inmate's escape history, and other factors, including the severity of the inmate's current charges, serious offense history, institutional disciplinary history, prior felony convictions, alcohol or drug abuse history and stability factors. Here, we know that Tate's initial criminal charges alone placed him in the highest classification level of "maximum." That, in conjunction with his particular escape attempt, necessitated his housing in administrative segregation, as he was deemed to be an escape risk and a security threat, warranting additional supervision provided there. While Tate claims these inmates have a history of escape charges / convictions, he has not provided the court with the necessary details and circumstances to find that these inmates were similarly situated to him. For instance, the court has no way of knowing whether they were charged with escape criminally or within the institution only. The court also does not know, for example, whether these inmates simply walked away from a work detail. The court also does not know each inmate's current criminal charge, criminal history or institutional behavior record. Such information is relevant in determining whether these inmates were similarly situated to Tate.

What the court does know, however, is that Tate sent a coded letter to his wife outlining a scheme to escape from custody during a scheduled court hearing and requesting her assistance. In part, Tate's plan included his wife leaving a truck, with a full tank of gas, cash in the console and keys in the ignition, near the courthouse. (Docket Item No. 40-2 at 7.) Tate also included a hand drawn map of the town and of the outside of the courthouse with the physical address of the courthouse. (Docket Item No. 40-2 at 4.) There also is evidence that Tate discussed this escape plan during phone calls with his wife from the Jail. (Docket Item No. 40-2 at 15.) If Tate's wife had agreed to assist him with this scheme, not only would Tate's life have been in danger, but so would those of the transporting

guards, the attorneys, the judge, courthouse staff and civilians. For these reasons, and given the Jail's points-based system for housing classifications, I find that there is no genuine dispute in material fact as to whether Tate is similarly situated with these other inmates sufficient to sustain a Fourteenth Amendment Equal Protection claim against Defendant Parks.

Furthermore, even if Tate could sufficiently demonstrate that he was similarly situated with the inmates he named, I find that he has failed to show that any differential treatment was the result of intentional or purposeful discrimination by Defendant Parks. To the contrary, as already explained, I find that the facts before the court show that Tate was placed in administrative segregation as a result of his own actions, including those which led to his initial criminal charges, as well as his scheme to escape from custody, which he does not deny. Therefore, I further find that there is no genuine dispute in material fact as to whether any disparate treatment was the result of intentional or purposeful discrimination by Defendant Parks.

Lastly, the court notes that, even if Tate could meet these two elements of his Equal Protection claim, Parks, nonetheless, would be entitled to summary judgment because Tate's placement in administrative segregation is reasonably related to the legitimate penological interest of maintaining the safety and security of the institution. *See Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002) (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (Unless a suspect class is involved, disparate treatment "is presumed to be valid and will be sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'")); *see also Olech*, 528 U.S. at 564 (applying rational basis review to class-of-one claims).

Next, Tate alleges in his Amended Complaint that Defendant Parks violated his First Amendment rights by opening and illegally searching his outgoing nonlegal mail. He also alleges in his Amended Complaint that such mail was censored, in violation of the First Amendment. I find that Defendant Parks is entitled to summary judgment on these claims.

For a nonmedical prison official, such as Defendant Parks, to be found liable under 42 U.S.C. § 1983, "it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation omitted). In her affidavit, Patrick testified that, as a result of Tate's escape attempt and his use of the mail to attempt to facilitate it, all of Tate's nonlegal mail was inspected prior to being placed in the mail. However, Patrick further testified that Defendant Parks was not personally involved in the inspection of Tate's or any other inmate's mail. The only response Tate offers to Patrick's testimony is his statement that Parks admitted to his outgoing mail being searched, but later denied it. He further alluded to the fact that, as Chief of Security at the Jail, Parks would have been involved in mail inspection. He stated as follows: "Bryan Parks who was Chief of Security was not personally involved in the inspection of Tate's mail. Is that not Security[?]" (Docket Item No. 59 at 18.) I find such statements speculative, at best, and certainly insufficient to raise a genuine dispute of material fact as to whether Parks searched his outgoing mail, let alone, did so illegally.

Therefore, I find that Defendant Parks is entitled to summary judgment on this claim because there is no genuine dispute in material fact as to whether Parks was personally involved in the inspection of Tate's outgoing mail. However, even if Tate could make such a showing, I would find Parks entitled to summary

judgment on alternate grounds. A prison rule that impinges on an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The Fourth Circuit has held that the opening and inspecting of an inmate's outgoing mail is reasonably related to legitimate penological interests and, therefore, does not violate the First Amendment. *See Altizer v. Deeds*, 191 F.3d 540, 547-48 (4th Cir. 1999). The obvious need to inspect Tate's outgoing mail is underscored by his use of the mail to send the coded letter to his wife asking for her assistance to escape from custody. Because the opening and inspecting of Tate's outgoing mail was reasonably related to a legitimate penological interest, I also would find that Defendant Parks, if he were personally involved in the inspection of Tate's outgoing mail, would be entitled to summary judgment on this ground, as well.

Tate also appears to attempt to raise a First Amendment claim based on censorship of his outgoing mail. However, the only facts that the court can discern in support of such a claim are that a letter that was presented to him by the Commonwealth's Attorney during a court hearing on May 26, 2017, was never placed into the United States mail by the Jail. However, Patrick provided sworn testimony that the Jail did not censor, delete, redact, alter or otherwise fail to deliver any of Tate's legal or nonlegal mail. (Patrick Affidavit at 2.) Additionally, for the same reasons cited above, there is no evidence that Defendant Parks was personally involved in the inspection of Tate's or any other inmate's mail. *See Wright*, 766 F.2d at 850.

For the above-stated reasons, I find that there is no genuine dispute of material fact regarding Parks's personal involvement in the inspection of Tate's mail. Thus, I further find that there is no genuine dispute of material fact as to

whether Defendant Parks violated Tate's First Amendment rights on his claim of censorship, and I will enter summary judgment in his favor on this claim.

Although Tate does not specifically categorize his allegation that he was denied access to the law library while housed in administrative segregation as a separate First Amendment violation of denial of access to the courts by Defendant Parks, liberally construing his Amended Complaint, as this court must, I will assume Tate intended such a claim. However, for the following reasons, I find that such a claim fails. First, it appears that Tate is complaining that inmates incarcerated in administrative segregation lack access to the law library at the Jail. This, he claims, prevented him from researching specific legal issues related to his pending charges. It appears that Tate is referring to his underlying criminal charges. Inmates have a constitutional right to reasonable access to courts to challenge their convictions or to vindicate their constitutional rights. *See Bounds v. Smith*, 430 U.S. 817, 838-41 (1977). However, "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance"; these options are means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds*, 430 U.S. at 825). *Bounds* requires "only a state-provided capability to bring an action related to a criminal appeal, collateral attack, or civil rights violation." *Lacey v. Braxton*, 2011 WL 3320801, at *12 (W.D. Va. Aug. 1, 2011) (citing *Lewis*, 518 U.S. at 356). Thus, it is clear that the right of access to the courts is rooted in an inmate's right to redress his grievances, not to defend himself in a criminal case. Therefore, any argument that Tate makes regarding access to the courts based on an inability to perform research for his defense in his criminal case simply is misplaced.

Moreover, in order to prevail on a First Amendment access to courts claim, an inmate must show a concrete injury. *See Lewis*, 518 U.S. at 349. A plaintiff must specifically identify a "non-frivolous legal claim that a defendant's actions prevented him from litigating." *Lacey*, 2011 WL 3320801, at \*12 (citing *Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002); *Lewis*, 518 U.S. at 353 n.3). Here, Tate alleges no such injury, and the court docket reveals that Tate has been able to file, among other things, a Complaint, an Amended Complaint and a response to Defendant Parks's Motion, thereby undercutting any argument based on his First Amendment right to access to the courts. It is for these reasons, that I find that there is no genuine dispute in material fact regarding whether Defendant Parks denied Tate access to the courts, and I will grant summary judgment in Parks's favor on this claim.

Lastly, Defendant Parks argues that he is entitled to summary judgment on qualified immunity grounds. I agree. Tate has sued Parks in both his official and individual capacities for monetary damages and injunctive relief. First, the court finds that Parks is immune from suit in his official capacity for monetary damages. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Additionally, the doctrine of qualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In conducting the qualified immunity analysis, "our first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). We then engage in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar*

*ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to take these steps in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, for all the reasons explained above, Tate has not adequately raised a genuine dispute in material fact as to whether Parks violated any of his constitutional rights. That being the case, I find that Parks is entitled to qualified immunity on all of Tate's claims.

In conclusion, for all of the reasons stated herein, I find that Defendant Parks is entitled to summary judgment on all of Tate's claims against him. Therefore, the court will grant Parks's Motion and enter summary judgment in Parks's favor on all of Tate's claims.

The court will enter an appropriate Order and Judgment.

**ENTERED:**          January 9, 2019.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE